IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANNY RAY GARCIA,                    No. 2:14-CV-0093-TLN-DMC-P

    Plaintiff,

  vs.                                FINDINGS AND RECOMMENDATIONS

TSENG,

    Defendant.

_____/

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court are the parties' cross-motions for summary judgment (Docs. 36 and 44).[1]

/ / /

/ / /

---

[1] Defendant initially responded to plaintiff's motion by way of a motion to strike portions of plaintiff's brief containing confidential information, see Doc. 41, which the court granted, see Doc. 57 (August 27, 2018, order). Defendant responded to the merits of plaintiff's motion with his cross-motion. Plaintiff filed an opposition, see Doc. 52, and defendant replied, see Doc. 53. Plaintiff filed a one-page surreply arguing that defendant is "now reaching by looking for legal technicalities that are out of plaintiff's legal capabilities," Doc. 55, which has not been considered because the Federal Rules of Civil Procedure do not allow for a surreply to a reply brief.

1

## I. SUMMARY OF THE CASE

Plaintiff claims defendant violated his Eighth Amendment rights with respect to housing placement and orthopedic devices requested as accommodations for a leg-length discrepancy, as well as complaints of shoulder and back pain. Defendant contends he was not deliberately indifferent to any serious medical need.

## II. PLAINTIFF'S ALLEGATIONS[2]

This action proceeds on the original complaint against Dr. Tseng, a physician at Mule Creek State Prison during the times relevant to the complaint. According to plaintiff, when he arrived at Mule Creek State Prison in 2006[3] he submitted paperwork requesting that he be provided with orthopedic shoes with a 1 3/4 inch heel lift. See Doc. 1, p. 3. Plaintiff claims that he has required such shoes since he was involved in an car accident when he was fifteen years old. See id. Plaintiff states that when he entered prison, first at Pleasant Valley State Prison then at Salinas Valley State Prison, he was provided with a 1 3/4 inch heel lift insert. See id. at 3, 5. When he was transferred to Mule Creek State Prison, however, plaintiff was "denied the lift for over a year. . . ." Id. at 5.

Next, plaintiff sates that, "out of the blues [sic]," his back went out causing him severe pain for which he took pain medication. See id. Plaintiff sates that "[a]fter it goes away, approx. seven months later my back goes out again. . . ." Id. According to plaintiff, Dr. Tseng "personally refuses to give me an MRI, only an x-ray knowing that it will not show soft-tissue

---

[2] Plaintiff's complaint consists of the court's three-page form complaint and three hand-written attached pages, enumerated as "1 of three," "2 of three," and "3 of three." The three attachment pages, however, appear to be out of order. The statement of claim begun on the last page of the court's form complaint appears to logically continue on attachment page "2 of three." Attachment page "2 of three" in turn appears to logically continue on attachment page "1 of three," which concludes on attachment page "3 of three." The court's summary of plaintiff's allegations is based on reading plaintiff's three attachment pages in this order.

[3] Defendant's evidence indicates plaintiff arrived at Mule Creek State Prison in May 2008, not in 2006.

2

damage (pinched nerve) and that I will receive a notice stating, no visible damage, everything's normal, no need for further medical care." Doc. 1, p. 5.

Next, plaintiff alleges that he sought medical treatment for shoulder pain. See id. According to plaintiff, x-rays were taken, which revealed no visible damage. See id. Plaintiff states that he "took the pain for a few more years" at which point he became unable to sleep at night. Id. Plaintiff then filed a medical care request asking for an MRI, but not an x-ray since he already had one. See id. at 5, 4. Plaintiff was told that he would need an x-ray because it had been over a year since the last x-ray. See id. According to plaintiff, following the x-ray he "once again" received a notice informing him "no more medical care needed." See id. at 4. Plaintiff states that "several months later" he received a "ducat" to see Dr. Lovett, an orthopedic surgeon. See id. According to plaintiff, when he saw Dr. Lovett, the doctor "put up the x-rays Dr. Tseng had taken of me and says, 'Oh Garcia, I've got bad news for you. First, you have arthritis in both your shoulders.' Then he says, 'Do you see these bumps (right shoulder); these are called spurs and you have then pretty bad. That's why you're in so much pain . . . .'" Id. Plaintiff also states that he was told by Dr. Lovett that his shoulders are not aligned. See id. Plaintiff alleges that, based on his discussions with Dr. Lovett, he was scheduled for MRI studies of his shoulders and eventual surgery. See id.

According to plaintiff, "everything is going smooth" then he receives "out of the blue" two forms signed by Dr. Tseng, one stating that the surgery had been canceled, and another stating that the MRIs have also been cancelled. Id. In response, plaintiff submitted a "medical 602" requesting that the MRIs and surgery be re-scheduled. See id. Plaintiff was called for an appointment with Dr. Tseng and, according to plaintiff, his first words were: "So! You 602 me huh?" Id. Plaintiff next states that he was told by Dr. Tseng, "I see you have all these chronos, I don't think you need them. . . ." Id. at 4, 6. Plaintiff states that he didn't believe that Dr. Tseng could have cancelled his chronos but later found out when he was ordered to move to an upper bunk in an upper tier cell that he didn't have any valid chronos for a lower tier or lower bunk.

3

See id. at 6. Plaintiff believes that Dr. Tseng cancelled his chronos out of spite. See id. Plaintiff states that he still has not received care for his shoulder. See Doc. 1, p. 6.

Plaintiff's complaint was found appropriate for service as to defendant Tseng. See Doc. 7 (June 26, 2014, order).[4]

### III. THE PARTIES' EVIDENCE

A. Plaintiff's Evidence

Plaintiff's evidence in support of summary judgment consists of his one-page declaration purporting to authenticate 16 attached exhibits. See Doc. 36, p. 19. According to plaintiff, all of the attached exhibits "are factual documents, copies of original documents, and are to be entered into this case . . . as evidence (11 pages of complaint, 15 exhibits)."[5] Id. Plaintiff attaches the following exhibits:

| | | |
|---|---|---|
| Exhibit 1 | | Inmate appeal, log no. MCSP-09-02024, dated November 2, 2009; 7 Form CDC 7362 requests for health care services; 1 radiology report dated October 28, 2009, of plaintiff's lumbar spine showing mild scoliosis, minimal anterior spurring, and no vertebral height reduction or interspace narrowing. See id. at pp. 21-31. |
| Exhibit 2 | | Inmate appeal stamped "received" on November 26, 2012.[6] See id. at pp. 33-34. |
| Exhibit 3 | | May 20, 2010, physician's request for services requesting an orthopedic boot or shoe lift; a June 10, 2010, Disability Placement Program form signed by defendant authorizing accommodation; a December 10, 2010, Accommodation Chrono signed by defendant authorizing a permanent bottom bunk, permanent orthopedic shoes and/or heel lift, and an extra mattress on a temporary basis through June |

---

[4] While the court's docket originally indicated a number of other individuals as defendants, they were listed in the complaint as the defendants to a prior action, see Doc. 1, p. 1, not the current action, in which Tseng is the only named defendant.

[5] Defendant objects on the bases that the documents are hearsay and not authenticated.

[6] The document is unsigned, undated, and is not assigned a prison log number.

4

| | | |
|---|---|---|
| 1 | | 2011; an August 24, 2010, first-level response to plaintiff's inmate appeal, log no. MCSP-09-02024, indicating that plaintiff was interviewed regarding his leg-length discrepancy issue, seen by defendant on June 10, 2010, who provided accommodations, and that his requests for an MRI and orthopedic mattress were denied. See Doc. 36, pp. 36-40. |
| 5 | Exhibit 4. | Medical consultation note dated June 24, 2010, indicating that plaintiff has "a very significant leg length discrepancy which makes climbing difficult;" plaintiff told Dr. Ziomek that the heel lift works well but he would prefer an orthopedic device "with the lift on it;" plaintiff was unhappy that he had been denied a lower tier cell assignment. See id. at pp. 42-43. |
| 9 | Exhibit 5 | January 10, 2009, Form CDC 7362 request for health care services submitted by plaintiff in which he complains of right and left shoulder pain; a January 29, 2009, report of x-rays of plaintiff's right knee and shoulder showing mild patella spurring of the right knee and a normal right shoulder; health care request form dated February 8, 2011, seeking treatment for plaintiff's left shoulder and specifically requesting an MRI not an x-ray; a February 17, 2011, report of normal x-rays of both of plaintiff's shoulders. See id. at pp. 45-50. |
| 14 | Exhibit 6 | June 9, 2011, consultation note completed by Dr. Lovett indicating the doctor's disagreement with Dr. Pepper's assessment of the x-rays; Dr. Lovett recommended conservative treatment, further evaluation in four weeks, physical therapy, and an injection in the right shoulder; Dr. Lovett did not recommend an MRI as plaintiff had requested. See id. at pp. 52-54. |
| 18 | Exhibit 7 | Physical therapy progress notes from three sessions in July and August 2011. See id. at 56-58. |
| 20 | Exhibit 8 | October 7, 2011, records from Doctors Hospital of Manteca indicating that plaintiff received an injection. See id. at pp. 60-75. |
| 22 | Exhibit 9 | Documents relating to Dr. Lovett's recommendation in August 2011 that an MRI be taken of plaintiff's left shoulder; report of October 31, 2011, MRI of plaintiff's left shoulder showing a complete tear proximal to the insertion of the humeral head; December 9, 2011, progress note completed by Dr. Farr recommending arthroscopic surgery to repair the left shoulder as well as an MRI to rule out problems with the right shoulder. See id. at pp. 77-81. |

5

| | | |
|---|---|---|
| | Exhibit 10 | Minutes of a January 5, 2012, meeting of the Mule Creek State Prison Medical Authorization Review Committee (MARC) denying a request for an MRI of plaintiff's right shoulder as not medically necessary; minutes of a January 23, 2012, MARC meeting denying the request for arthroscopic surgery as not medically necessary. See Doc. 36, pp. 83-86. |
| | Exhibit 11. | Plaintiff's inmate appeals and responses thereto. See id. at pp. 88-116. |
| | Exhibit 12 | Plaintiff's request for copies of records. See id. at pp. 118-19. |
| | Exhibit 13 | A November 21, 2012, Accommodation Chrono completed by defendant authorizing a permanent heel lift; a January 13, 2013, Accommodation Chrono completed by defendant authorizing a temporary "Ad-Tec" shoe and a permanent heel lift; an April 8, 2013, Accommodation Chrono completed by defendant changing the authorization for the "Ad-Tec" shoe from temporary to permanent. See id. at pp. 121-29. |
| | Exhibit 14 | Documents relating to plaintiff's requests for arthroscopic surgery and an MRI. See id. at pp. 131-40. |
| | Exhibit 15 | Documents relating to defendant's October 2012 denial of plaintiff's continued requests for an MRI and surgery. See id. at pp. 142-43. |
| | Exhibit 16 | Plaintiff's requests for health care and inmate appeals regarding health care from 2015, 2016, and 2017. See id. at pp. 145-58. |

B. **Defendant's Evidence**

Defendant's evidence in support of summary judgment consists of his own declaration, see Doc. 44-5, as well as plaintiff's June 8, 2017, deposition, see Doc. 44-6, Exhibit A. According to defendant, the following facts are undisputed:

Background Facts

1. Defendant was plaintiff's primary care physician during all times relevant to the complaint. See Doc. 44-5, ¶¶ 1-2, see also Doc. 44-6, Exhibit A, p. 22.

2. Plaintiff has a leg-length discrepancy of 1 3/4 inches. See Doc. 44-5, ¶¶ 24, 53, see also Doc. 44-6, Exhibit A, pp. 28-29.

3. During all times relevant to the complaint, plaintiff was engaging in rigorous exercise. See Doc. 44-5.

4. As of December 2008, plaintiff was playing handball nearly every day. See Doc. 44-6, Exhibit A, pp. 48-49.

5. In February and March 2009, plaintiff was doing 600 to 700 push-ups every day. See id. at p. 52.

6. In April 2009, plaintiff reported that he was very active and that he felt good. See id.

7. In February 2011, plaintiff was still exercising regularly, doing as many as 1,300 push-ups and 300 sit-ups per day. See id.

8. Plaintiff was maintaining this exercise regimen as of June 2011, despite popping and clicking sounds in his left shoulder. See Doc. 44-6, p. 72; see also Doc. 44-5, ¶¶ 131, 140.

9. On June 10, 2011, defendant advised plaintiff to reduce his level of activity due to complaints of shoulder pain. See Doc. 44-5, ¶ 140.

10. Plaintiff was informed on November 8, 2011, that he had a torn rotator cuff, but continued to do push-ups and attempt to play handball through November and December 2011. See id. at ¶¶ 262-63, 274.

11. As of October 18, 2012, plaintiff was trying to play handball despite complaints of shoulder and back pain. See id. at ¶¶ 213-14.

12. During the time period relevant to the complaint, plaintiff had over 30 medical appointments addressing complaints of back pain, shoulder pain, accommodation chronos, or orthopedic shoes, and plaintiff had been prescribed three medications for pain relief. See generally Doc. 44-5.

13. Defendant personally examined plaintiff on at least 11 occasions during this time period, and personally renewed prescriptions for pain medication. See id.

14. Plaintiff does not recall defendant ever cancelling any of his pain medications. See Doc. 44-6, Exhibit A, p. 43.

15. In September 2008, October 2009, and May 2011, defendant determined that narcotic pain medication was not medically indicated to treat plaintiff's complaints of pain. See Doc. 44-5, ¶¶ 40, 87, 126-27.

///

///

Facts Relating to Accommodation Chronos

1. An "accommodation chrono," Form CDC 7410, is a document that provides an inmate with a temporary or permanent accommodation (e.g., for a lower bunk, lower tier cell, or orthopedic device). See id. at ¶ 17.

2. As of plaintiff's arrival at Mule Creek State Prison, plaintiff had accommodation chronos for orthopedic boots and supports, an extra pillow, and a new mattress; plaintiff did not have an accommodation chrono for either a lower bunk or lower tier cell. See id. at ¶¶ 16, 18.

3. Plaintiff was provided a temporary accommodation chrono for a lower bunk when he arrived at Mule Creek State Prison in May 2008, but for the remainder of that year Dr. Soltanian and Physician's Assistant Todd concluded that there a lower bunk chrono was not medically indicated. See Doc. 44-5, ¶¶ 21, 28, 35, 39, 40, 50; see also Doc. 44-6, Exhibit A, pp. 39-40.

4. Despite these contrary opinions, on November 12, 2008, Dr. Ziomek, a podiatrist, authorized accommodation chronos for a lower bunk, lower tier cell, and an extra mattress, see Doc. 44-5, ¶ 55, and defendant renewed these chronos on April 9, 2009, even though he and Dr. Ziomek had previously disagreed about the medical necessity for such accommodations, see id. at ¶¶ 78-79, see also Doc. 44-6, Exhibit A, pp. 45-46.

5. Defendant also authorized an extra pillow on April 9, 2009, even though another provider had denied the request less than a month prior. See Doc. 44-5, ¶¶ 71, 78.

6. On June 10, 2010, defendant renewed all of plaintiff's chronos except authorization for a lower tier cell because defendant determined that accommodation was not medically indicated. See id. at ¶¶ 101-103, 106. Dr. Soltanian concurred with this decision on August 26, 2010. See id. at ¶¶ 108-10.

7. By October 18, 2012, the chronos for a lower bunk and extra mattress had expired, and plaintiff submitted a request to the chief medical officer for review. See id. at ¶¶ 217-18.

8. On November 15, 2012, defendant recommended discontinuation of accommodation chronos for a lower bunk and extra mattress, finding that there was no objective evidence of impairment of plaintiff's activities of daily living to support such accommodations. See id. at ¶ 224.

9. Dr. Soltanian and the chief medical officer concurred with discontinuation of chronos for a lower bunk, lower tier cell, and an extra mattress. See id. at ¶¶ 226, 231.

8

10. During the times relevant to the complaint, defendant personally addressed plaintiff's requests for various accommodation chronos during at least four appointments. See generally Doc. 44-5.

11. Defendant only discontinued a chrono based on his determination that the accommodation was not medically indicated. See id. at ¶¶ 103, 206-10, 218.

Facts Relating to Plaintiff's Request for Orthopedic Devices

1. When plaintiff arrived at Mule Creek State Prison, he had either an insole support or small heel lift to accommodate his leg-length discrepancy. See id. at ¶¶ 30, 36.

2. Defendant personally observed on at lease four occasions that plaintiff's ambulation or gait was normal and that plaintiff had no significant difficulty walking. See Doc 44-5, ¶¶ 9, 97, 175, 215, 234.

3. During the time period relevant to the complaint, defendant renewed plaintiff's accommodation chronos for orthopedic shoes or heel lifts, or both, on at least four occasions. See id. at ¶¶ 8, 79, 101, 225, 239.

4. Defendant never revoked a chrono authorizing orthopedic shoes or heel lifts. See id.

5. On December 24, 2012, defendant found that plaintiff was not wearing the prescribed orthopedic boots because plaintiff refused to pay for them. See id. at 235-37. To accommodate plaintiff, defendant submitted a request for over-the-counter boots. See id. at 238-39.

6. During the times relevant to the complaint, defendant personally addressed plaintiff's leg-length discrepancy, his need for orthopedic shoes, or his need for heel lifts during at least four appointments. See id. at ¶¶ 77-79, 101, 232-33.

Facts Relating to Plaintiff's Complaints of Back Pain

1. Defendant personally addressed plaintiff's complaints of back pain during at least five appointments. See id. at ¶¶ 44, 75-77, 96-99, 125-26, 212.

2. During several examinations, it was noted that plaintiff's back was symmetrical, had good range of motion, and had no significant tenderness to palpation. See id. at ¶¶ 34, 46, 76, 85, 97.

3. No medical provider at Mule Creek State Prison ever diagnosed plaintiff with a "pinched nerve." See generally Doc. 44-5.

    4.    Defendant did not think an MRI of plaintiff's back was medically indicated during any time relevant to the complaint. See id.

    5.    There was no objective indication that plaintiff's activities of daily living were impaired by back pain. See id. at ¶¶ 11, 96-97.

Facts Relating to Plaintiff's Complaints of Shoulder Pain

    1.    Defendant personally addressed plaintiff's complaints of shoulder pain during at least four appointments. See id. at ¶¶ 122, 173, 194-95, 205-06.

    2.    A January 29, 2009, x-ray of plaintiff's right shoulder was within normal limits. See id. at ¶¶ 59-60, 65.

    3.    Dr. Pepper interpreted February 17, 2011, x-rays of both of plaintiff's shoulders to be within normal limits. See Doc. 44-5, ¶¶ 118-20.

    4.    On June 9, 2011, Dr. Lovett disagreed, concluding that the x-rays showed impingement of the rotator cuff and arthritis. See id. at ¶¶ 133-35. Dr. Lovett recommended a steroid injection and physical therapy, but did not recommend an MRI. See id. at ¶¶ 136-38, see also Doc. 44-6, Exhibit A, pp. 73, 75.

    5.    Plaintiff received three physical therapy sessions in July and August 2011, at which time he reported that his pain was four out of ten. See Doc. 44-5, ¶¶ 142-44.

    6.    The physical therapist reported that plaintiff's range of motion in his shoulders was within functional limits, despite the presence of pain and popping in plaintiff's left shoulder. See id. at ¶¶ 143-46.

    7.    On October 7, 2011, plaintiff received a steroid injection into his right shoulder. See id. at ¶ 153.

    8.    On October 31, 2011, plaintiff received an MRI of his left shoulder and was diagnosed with a complete tear of the supraspinatus tendon in his rotator cuff. See id. at ¶¶ 156-57, 161, 171.

    9.    On December 9, 2011, Dr. Farr recommended that arthroscopic surgery to repair the left shoulder be considered, as well as an MRI of the right shoulder to rule out similar injury. See id. at ¶ 172.

    10.    Defendant disagreed because even a complete tear does not require surgery where the patient is able to complete activities of daily living and functional normally, and there was no objective evidence that plaintiff's shoulder injury impaired his activities of daily living. See id. at ¶¶ 12-13, 175-76.

///

11. Despite his disagreement with Dr. Farr, defendant submitted two requests to the Medical Authorization Review Committee (MARC) requesting arthroscopic surgery on plaintiff's left shoulder and an MRI of plaintiff's right shoulder. See id. at ¶¶ 12, 178.

12. The MARC, a committee of medical professionals that reviews cases that are high risk, challenging, or that involve services that are not necessarily medically indicated, denied the request for an additional MRI on January 5, 2012. See id. at ¶¶ 179, 180, 184.

13. The MARC denied the request for arthroscopic surgery on January 19, 2012. See id. at ¶ 191.

14. The MARC's decisions were based on a review of plaintiff's medical records and testimony from defendant. See id. at ¶¶ 12, 185, 193.

15. For the remainder of 2012, plaintiff's shoulder condition remained stable and he continued to complete activities of daily living. See Doc, 44-5, ¶¶ 199, 207-10, 223, 231.

16. Defendant opted for conservative treatment of plaintiff's shoulder complaints because plaintiff's activities of daily living did not appear to be impaired. See id. at ¶¶ 199, 210.

IV. STANDARD FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a

genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

## V. DISCUSSION

Defendant argues that plaintiff cannot establish that he was deliberately indifferent with respect to plaintiff's request for accommodation chronos or complaints of back pain and shoulder pain. According to plaintiff, the evidence shows a delay in providing medical treatment.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: first, objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and second, subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth

Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh,

90 F.3d 330, 332 (9th Cir. 1996).

  A.  <u>Plaintiff's Motion</u>

  Plaintiff argues the evidence shows that defendant unconstitutionally delayed providing medical treatment. Having thoroughly reviewed plaintiff's evidence, the court finds that plaintiff has not met his initial burden of demonstrating the absence of a genuine issue of material fact. To prevail on the subjective element of his Eighth Amendment claim, plaintiff must show that defendant delayed providing medical treatment unnecessarily and wantonly for the purpose of inflicting harm. <u>See</u> <u>Farmer,</u> 511 U.S. at 834. Plaintiff has failed to do so with respect to any of the medical issues about which he complains.

  As to accommodation chronos generally and accommodation for orthopedic devices specifically, which address plaintiff's leg-length discrepancy, plaintiff's own evidence undermines his position by indicating that defendant granted accommodations related to plaintiff's leg-length discrepancy on numerous occasions without delay. For example, plaintiff's Exhibit 3 reflects that defendant authorized accommodation chronos for a lower bunk, orthopedic shoes and/or a heel lift, and an extra mattress on December 10, 2010. <u>See</u> Doc. 36, pp. 36-40. Similarly, plaintiff's Exhibit 13 indicates that defendant authorized a heel lift on November 21, 2012, and orthopedic shoes on January 13, 2013, and April 8, 2013. <u>See id.</u> at pp. 121-29.

  It is apparent from plaintiff's evidence that he was not satisfied with defendant's decision not to authorize placement in a lower tier cell as well as defendant's discontinuation of the lower bunk chrono. For example, plaintiff attaches at Exhibit 4 a June 24, 2010, medical consultation note in which Dr. Ziomek records that plaintiff was unhappy that he had been denied a lower tier cell assignment. <u>See id.</u> at pp. 42-43. Additionally, while not relevant to the instant motions because it concerns dates after plaintiff filed his complaint, Exhibit 16 reflects that plaintiff continued to be dissatisfied with the bunk and tier placement decisions throughout 2015, 2016, and 2017. <u>See id.</u> at pp. 145-58. As a matter of law, however, plaintiff's dissatisfaction with defendant's medical decision does not rise to the level of an Eighth

Amendment violation.  See Jackson, 90 F.3d at 332.

Even reading plaintiff's argument more broadly to encompass the denial of accommodations and not just delay, plaintiff has not shown that he is entitled to judgment as a matter of law.  To prevail on summary judgment, plaintiff would have to show with undisputed admissible evidence that defendant's decisions with respect to accommodations were based on a desire to inflict harm.  See Farmer, 511 U.S. at 834.  Not only does plaintiff fail to meet this burden but, as discussed below, the court finds that defendant's undisputed evidence establishes just the opposite.

Regarding complaints of pain, it appears that plaintiff's claim of delay stems from the time between his request for health care services submitted in January 2009, Dr. Lovett's interpretation of x-rays in June 2011, and Dr. Farr's recommendations in December 9, 2011.  Plaintiff's evidence, however, does not indicate delay, let alone a delay by defendant despite knowing of a serious problem.  Rather, plaintiff's Exhibit 5 indicates that plaintiff complained of shoulder pain in January 2009 and x-rays were taken that same month showing a normal right shoulder.  See Doc 36, pp. 45-50.  Plaintiff then sought treatment again for his shoulder in February 2011, and x-rays were again taken that same month which Dr. Pepper interpreted as normal.  See id.  Thus, as of the time plaintiff sought treatment in February 2011, the medical file showed normal x-rays.  This evidence fails to establish that defendant was the source of any delay between early 2009 and early 2011 with respect to plaintiff's complaints of shoulder and back pain.

The remainder of plaintiff's evidence relates to treatment he received in 2011 regarding his pain complaints.  Plaintiff's Exhibit 6 indicates that Dr. Lovett disagreed with Dr. Pepper's interpretation of the x-rays in June 2011.  See id. at pp. 52-54.  According to Exhibit 7, plaintiff received physical therapy in July and August 2011.  See id. at pp. 56-58.  Plaintiff's Exhibit 8 reflects that he received a steroid injection for pain at Doctors Hospital of Manteca in October 2011.  See id. at pp. 60-75.  Exhibit 9 indicates that Dr. Lovett recommended an MRI of

plaintiff's left shoulder, which was conducted on October 31, 2011, and showed a complete tear proximal to the insertion of the humeral head. See id. at pp. 77-81. This exhibit also shows that Dr. Farr recommended surgery and a further MRI study on December 9, 2011, see id., but those recommendations were denied in January 2012 by the Medical Authorization Review Committee, as indicated by plaintiff's Exhibit 10, see id. at pp. 83-86. This evidence also fails to show any delay on the part of defendant, let alone delay for the purpose of causing harm.

B. Defendant's Motion

For purposes of his motion, defendant concedes the objective element and argues that he is entitled to judgment as a matter of law because the undisputed facts show that he was not deliberately indifferent to plaintiff's medical needs. The court agrees.

Defendant's evidence shows that he consistently responded to plaintiff's medical issues. Defendant personally examined plaintiff on at least 11 occasions during the times relevant to the complaint, and personally renewed prescriptions for pain medication. See Doc. 44-5. During the times relevant to the complaint, defendant personally addressed plaintiff's requests for various accommodation chronos during at least four appointments. See generally Doc. 44-5. Defendant personally addressed plaintiff's complaints of back pain during at least five appointments, see id. at ¶¶ 44, 75-77, 96-99, 125-26, 212, and personally addressed plaintiff's complaints of shoulder pain during at least four appointments, see id. at ¶¶ 122, 173, 194-95, 205-06.

Defendant's evidence also shows that he consistently provided plaintiff with accommodations for an orthopedic device, see id. at ¶¶ 8, 79, 101, 225, 239, and discontinued or denied other accommodations only when he felt they were not medically necessary, see id. at ¶¶ 103, 206-10, 218. As to back pain, defendant's evidence shows that his decision not to order an MRI of plaintiff's back and instead to pursue a course of conservative treatment was based on unremarkable objective evidence on examination, see id. at ¶¶ 34, 46, 76, 85, 97, as well as a lack of evidence of limitation of plaintiff's activities of daily living, see id. at ¶¶ 11, 96-97.

1 Defendant's evidence establishes that surgery on plaintiff's left shoulder and an MRI of
2 plaintiff's right shoulder were not medically indicated. See id. at ¶¶ 12-13, 175-76, 199, 210.
3 While there was no objective evidence that plaintiff's shoulder problems impaired his activities
4 of daily living, see id., defendant nonetheless requested that the procedures be authorized, see id.
5 at ¶¶ 12, 178.

6 With respect to activities of daily living, defendant's evidence supports his
7 medical conclusions and establishes that, despite complaints of pain, plaintiff remained
8 extremely active during the relevant time period. Plaintiff testified at his deposition that he was
9 playing handball nearly every day as of December 2008. See Doc. 44-6, Exhibit A, pp. 48-49.
10 He also testified that he was doing 600-700 push-ups daily in February and March 2009. See id.
11 at p. 52. Plaintiff testified that he was very active and felt good in April 2009. See id. Plaintiff
12 further testified that in February 2011, he was still exercising regularly, doing as many as 1,300
13 push-ups and 300 sit-ups per day. See 44-6, Exhibit A, p. 52. Plaintiff testified that he was
14 maintaining this exercise regimen as of June 2011, despite popping and clicking sounds in his
15 left shoulder. See id. at 72; see also Doc. 44-5, ¶¶ 131, 140. On June 10, 2011, defendant
16 advised plaintiff to reduce his level of activity due to complaints of shoulder pain. See Doc. 44-
17 5, ¶ 140. In November 2011, plaintiff was informed that he had a torn rotator cuff, yet he
18 continued to do push-ups and play handball through December 2011, see id. at ¶¶ 262-63, 274,
19 and plaintiff was trying to play handball as of October 2012 despite complaints of shoulder and
20 back pain, see id. ¶ 213-14.

21 Defendant has met his initial burden of identifying the evidence which he believes
22 is undisputed and shows that plaintiff cannot prevail on an essential element of his claim.
23 Accordingly, the burden shifts to plaintiff to point to evidence showing a genuine dispute of
24 material fact. As discussed above, the evidence offered by plaintiff in support of his own motion
25 / / /
26 / / /

for summary judgment fails to meet this burden.[7] Because plaintiff cannot prevail on the subjective element of his claim, defendant is entitled to judgment in his favor as a matter of law.

## VI. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Plaintiff's motion for summary judgment (Doc. 36) be denied; and
2. Defendant's motion for summary judgment (Doc. 44) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

September 12, 2018

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

---

[7] Though presented differently, the documents submitted by plaintiff with his opposition to defendant's motion for summary judgment are duplicative of the documents attached as exhibits to his own motion. See generally Doc. 52-3. The court has also considered plaintiff's verified complaint. See Doc. 1.